1          UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF OHIO
2               EASTERN DIVISION

3               - - - - -

4


5   UNITED STATES OF AMERICA,        )
                                     )
6               Plaintiff,           )    Case No.
                                     )
7               vs.                  )    12CR062
                                     )
8   ERNEST McCLAIN,                  )
                                     )
9               Defendant.           )

10

11               - - - - -

12


13   TRANSCRIPT OF PROCEEDINGS HAD BEFORE THE HONORABLE

14      JUDGE DAN A. POLSTER, JUDGE OF SAID COURT,

15       ON FRIDAY, NOVEMBER 30TH, 2012,

16        COMMENCING AT 1:30 O'CLOCK P.M.

17               - - - - -

18

19

20

21   Court Reporter:              GEORGE J. STAIDUHAR
                                  801 W. SUPERIOR AVE.,
22                                SUITE 7-184
                                  CLEVELAND, OHIO 44113
23                                (216) 357-7128

24               - - - - -

25

1    APPEARANCES:

2        On behalf of the Government:

3            OFFICE OF THE U.S. ATTORNEY
             BY:  MICHAEL SULLIVAN, AUSA
4                 KENDRA KLUMP, AUSA
             801 W. Superior Avenue, Suite 400
5            Cleveland, OH 44113

6

7        On behalf of the Defendant:

8            McGINTY, HILOW & SPELLACY
             BY:  WILLIAM McGINTY, ESQ.
9            1300 Rockefeller Building
             614 W. Superior Ave.
10           Cleveland, OH 44113

11                          - - - - - -

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        P R O C E E D I N G S

2                THE COURT:  Good afternoon.  Please be

3     seated.

4                All right.  We are here on case 1:12CR62,

5     United States versus Ernest McClain.  Mr. McClain is here

6     with Mr. McGinty.  I have Mr. Sullivan and Ms. Klump for

7     the Government.  And I assume we will have Mr. Abraham

8     for the Probation Department.

9                We are here for sentencing, and Mr. McClain

10    entered a guilty plea pertaining to trafficking a minor

11    across state lines for the purposes of prostitution.  I

12    requested the preparation of a presentence report, which

13    I have received and reviewed.

14                Mr. McClain, have you received a copy of the

15    report?

16                THE DEFENDANT:  Yes, your Honor.

17                THE COURT:  And did you have a chance to

18    read it carefully, to discuss it with Mr. McGinty, and

19    to ask him any questions about it that you might have

20    had?

21                THE DEFENDANT:  Yes, your Honor.

22                THE COURT:  All right.  There are no

23    objections to the report filed by the Government or the

24    Defendant.

25                I want to go over the advisory calculations.

1    They are, in fact, only advisory, but I am required to

2    calculate the advisory range correctly.  We start at a

3    base offense level of 12.  We add two levels because

4    Mr. McClain and his co-Defendant used a computer to

5    entice the victim or to entice persons to engage in

6    sexual conduct with the victim who was a minor.

7           We add two more levels because this offense

8    involved the commission of sex acts or sexual contact,

9    and we add two more levels because the evidence shows

10   that Mr. McClain was an organizer or leader in activity

11   that did not involve five or more participants.  So 30

12   plus 2 plus 2 plus 2 is 36.  There are multiple counts,

13   but that doesn't change the adjusted offense level.  So

14   it stays at 36.

15          Now, the probation department has not

16   recommended the adjustment for acceptance of

17   responsibility based on the version that is reflected for

18   the Defendant.

19          Mr. McGinty, you didn't object to that, so I

20   take it you agree that your client should not get the

21   adjustment?

22          MR. McGINTY:  Judge, I don't agree with

23   that.  I think he should, but I have also met with my

24   client during the course of reviewing this right here,

25   and I was hoping the Court would allow him to speak with

1  you so that he can confirm the fact that his admission of

2  guilt, acceptance of responsibility in this case so he

3  could get the benefit of that under the Sentencing

4  Guidelines.  That's the best I could do.

5           THE COURT:  Well, I will take that under

6  advisement when it comes to hearing from Mr. McClain.  I

7  agree with Mr. Abraham, that what he said so far doesn't

8  cut it with me.  So based on what he said, I don't

9  believe he is eligible for the two levels.

10           I assume, Mr. Sullivan, and, Ms. Klump, that

11  if Mr. McClain qualifies for the two levels, you will

12  move for the third level off.  Is that right?

13           MR. SULLIVAN:  Yes.

14           THE COURT:  Okay.  All right.  Well, it is

15  3 or nothing.  So it is either 36 if there is no

16  acceptance and a 33 if there is.  Mr. Abraham has

17  correctly computed, added up all the points and comes up

18  with Criminal History Category V.

19           Now, I have Mr. McGinty's sentencing

20  memorandum in which he argues — you argue that V

21  overstates the dangerousness of Mr. McClain, and I guess

22  you can argue that in your remarks if you wish.

23           MR. McGINTY:  Thank you, your Honor.

24           THE COURT:  But if we count all the points,

25  you agree we are in Criminal History Category V?

1          MR. McGINTY:  I do, your Honor.

2          THE COURT:  All right.  Well, a 36-V is 292

3    to 365, and a 33-V is 210 to 262.  Obviously, if you

4    convince me that it should be a IV, Category IV, that

5    would be a little less.  Okay.

6          Then I will hear from both counsel and, of

7    course, from Mr. McClain if he wishes.

8          So, Mr. McGinty?

9          MR. McGINTY:  Thank you, your Honor.  Shall

10   I go to the podium?

11         THE COURT:  Either way, Bill, that's fine.

12         MR. McGINTY:  Judge, if it please the Court,

13   what I would like to say and to follow up what I said in

14   my sentencing brief is that he came from a — didn't

15   start off with the best of a family foundation.  He has a

16   wonderful mother, present here today.  He has family

17   members, sister, first cousin and an aunt that are here

18   and truly love Mr. McClain, there is no question about

19   that, and they have been here on a number of other

20   occasions when we appeared before the Court.

21         But that doesn't change the fact that he was

22   the product of a relationship where it was not marriage.

23   His mother was age 15, started off going first residing

24   with her mother, and I found out today — and I was not

25   able to put it in my brief — the reason they wanted to

1    foster care because there was incest inside the house.

2    So he started out with that, went into foster care, and

3    then into public housing thereafter.

4              There was no involvement from the natural

5    father and pretty much to this day has been hit or miss,

6    at best, with his father; hasn't seen him in a while, and

7    at the age of 15, he suffered a serious car accident, one

8    that involved about three and-a-half years I think total,

9    in and out of hospitals for two years.  Presently as a

10   result of that accident, he still has rods in his femurs

11   in both legs.

12             And as you can see he suffered serious

13   physical damage to his head, which resulted in a number

14   of surgeries, to do the best they possibly could with a

15   scarring issue.

16             Thereafter, ambulation was a problem for a

17   while and took him a number of years to get full use of

18   his legs.  Now, when he is at the institution, he has a

19   cane at all times that he is supposed to use while he

20   gets around.  And he indicates — and I put into my

21   brief, and I think it is important — is that during the

22   winter months, when it really gets bad, he needs the

23   ability to have a wheelchair because he just can't get

24   around at that point.

25             Judge, one of the things in talking to his

1    mother and in meeting with my client, Mr. McClain

2    sometimes — and I think it is due to this bipolarness or

3    manic depressive that he has difficulty at times, he is

4    open and approachable and can discuss the matter with him

5    and other times you don't get that.

6            I remember when we sat down when we were

7    going through the probation report, we sat for about a

8    half hour doing this handwriting, which he did in his own

9    handwriting at that time.  It was difficult.

10           When I came to see him with the probation

11   report, to go over it the first time, I was there, the

12   meeting lasted about 8 or 10 minutes and didn't get far.

13   I came back a few days later and gave him the opportunity

14   to go through it.  At that time, we had great

15   communications.  I was there for over an hour.  We

16   discussed the matter in detail.

17           I discussed with him the way the Court

18   works, the Sentencing Guidelines works, and the

19   importance of his sentence in the sentencing scheme.  I

20   can't do it for him, and that's the problem we have.

21   Today I want him to speak to you because, when I last saw

22   him last week, that's what he indicated that he would do.

23   Today he is indicating to me that he doesn't want to

24   speak with you.

25           THE COURT:  It is his right either way, and

1       I will certainly give him the opportunity.

2                       MR. McGINTY:  Thanks, Judge.  I understand

3       it is his right.  The problem is that what I am dealing

4       with when I go through this process right here, when I

5       get to the point where I need him to come over here

6       because it is so important, it is like a potential for

7       six years savings in his life going forward.

8                       Anybody that wouldn't want to get up and

9       talk about that, I hope he would do it for his mother,

10      more importantly, he might do it for his child, get up

11      there and speak to us.

12                      Judge, one thing that I would ask, we go

13      ahead and look at his alcohol and drug usage from an

14      early age on.  I think it is 13 or 14.  In my brief, it

15      started at the age of 13.  At the age 14, he was smoking

16      up to 14 marijuana cigarettes a day and then started

17      using cocaine since about 2000 and then also ecstasy at

18      an early age as well.

19                      Judge, again, it is just a multitude of bad

20      things happening in his life that he just happens to

21      gravitate to.  Judge, just to go through an aside on that

22      2-point reduction, if I can speak to that for a second, I

23      think that's an overstatement, I guess, is a better way

24      for me to put it.

25                      Judge, he was arrested on the case, was in

1    county jail awaiting a felony case.  He went down to the

2    municipal court, and basically, as I refer to it, as a

3    cleanup.  Over the last four, five years, I think any

4    practitioner would tell you that the Cleveland Municipal

5    Court, most of the city jurisdictions are attempting to

6    get people licensed properly so that we don't have

7    unlicensed, non insured drivers operating.  Most likely

8    he would have had that available to him.

9          And since he was going to prison on the

10   county case, which happened a couple days afterwards,

11   then he was held for a report by the Court to go with him

12   when he went to prison, oftentimes the Court in that

13   situation would strictly nolle the case because he is

14   going to jail.

15         So the cleanup right here, I venture to say,

16   that any practitioner would readily admit that if the

17   situation would arise, where he knew he was going to

18   subject himself to a potential for getting possibly

19   another twelve weeks and 24 months of sentence, that by

20   just doing that cleanup, they wouldn't do it.  They would

21   have advocated fully.

22         And I think that — I know that I committed

23   that error as well as a practitioner many times when we

24   go ahead and the case is not strong and the prosecutor

25   reduces it from a felony to a misdemeanor possession, and

1    I know I have done it.  And instead of just making it a

2    straight misdemeanor possession, they make it a

3    misdemeanor trafficking, which basically the elements are

4    almost the same, but one has a more serious impact.  When

5    one comes over to the Federal Sentencing Guidelines, it

6    is another.

7              THE COURT:  Well, there are two of these

8    convictions, one in paragraph 68 and one in paragraph 70.

9    He was sentenced to both on August the 16th of 2006, but

10   the first conduct was September '05, and the second was

11   August '06, two different times.

12             MR. McGINTY:  Judge, I am on paragraph 69,

13   page 17.  Is that right?

14             THE COURT:  Well, 69 is the trafficking,

15   drug trafficking.

16             MR. McGINTY:  Right.

17             THE COURT:  That's the cleanup?

18             MR. McGINTY:  No.  The cleanup is the one

19   that is below it.  It is a license required to operate,

20   which is paragraph 70.

21             MR. SULLIVAN:  Judge, if I may, I think the

22   one in paragraph 68 shows two sentences.  He was arrested

23   in September of '05; was sentenced on September 13th for

24   180 days.  He then was put on probation.  When he got

25   arrested the second time —

1          THE COURT:  You are right, Mr. Sullivan.  We

2     have got two times.  Mr. Sullivan is right.  Paragraph 68

3     — we have two times — on September 13th, '05

4     Mr. McClain was arrested, charged with driving without a

5     license.  On August 11th, 2006, eleven months later he

6     was arrested, charged with the same offense, but it is a

7     year later.

8          He was sentenced in the '05 case the same

9     day, and September 13th he got 180 days jail suspended,

10    one year probation.  Then he had a probation violation,

11    and he got the 180—day jail sentence imposed, and that's

12    why he got the two points.

13         And so — and we have got a drug trafficking

14    in March of '06 and then another license violation in

15    August '06.  So I don't quite understand this cleanup

16    concept, why these aren't separate offenses as they are

17    written and charged or charged and detailed in the

18    report.

19         MR. McGINTY:  My point is, Judge, is that

20    had he not been in jail or had he — he had the ability

21    to go ahead and get his license reinstated had he not

22    been in jail, that charge would have been dismissed if he

23    came up with a good license.  They give you up to 90 to

24    120 days to go ahead and do that.

25         THE COURT:  He didn't have a good license,

1   did he?

2           MR. McGINTY:  Nor did he have the

3   opportunity to get it because he was in jail on the

4   felony case above.  So what happens is that they take him

5   downstairs, and they just plead no contest, it is not

6   going to cost any time to go into jail on the felony

7   case.  That's why —

8           THE COURT:  I don't see the felony case that

9   he is going to jail on.  He went to jail on October 16th

10   of '06 for 180 days for two things:  The probation

11   violation stemming from his first, driving without a

12   license in '05, and then his second, driving without

13   a license.  It looks like he got 180 days for both,

14   but —

15           MR. McGINTY:  Judge, if I may, on the case

16   in paragraph 69, case number 479709, he was arrested on

17   September 28th, 2006.  He was arraigned the next day.

18   Pretrial was held on 10-6.

19           THE COURT:  What paragraph is this?

20           MR. McGINTY:  Well, it is the court docket I

21   have.

22           THE COURT:  You have got to go by the

23   report.

24           MR. McGINTY:  Paragraph 69.

25           THE COURT:  All right.  Paragraph 69 shows

1    he was arrested March the 8th.

2              MR. McGINTY:  Right.

3              THE COURT:  And he was sentenced on November

4    the 3rd.

5              MR. McGINTY:  Correct, of 2006.

6              THE COURT:  Right.

7              MR. McGINTY:  So he is in jail from the 28th

8    of September, all right, and he is over at the county,

9    and so they bring him over on the municipal court case on

10   October 16th.  He knows what's happening to him.  He has

11   discussed this with his counsel, and he takes a plea on

12   paragraph 70 because it is not going to cost him anything

13   in the system is my point.

14             Had he been out on bond, if we hadn't had

15   that paragraph above, he would have had the opportunity

16   at that point in time to get his license, a hard physical

17   license and present it to the Court for dismissal of the

18   case.

19             THE COURT:  Except he didn't have a license.

20             MR. McGINTY:  I understand that.

21             THE COURT:  So he couldn't.  Whether he had

22   the opportunity or not, it wouldn't have mattered.  He

23   didn't have a license.

24             MR. McGINTY:  I understand he didn't have

25   the license.  I got that.

1          THE COURT:  All right.  I hear your

2    argument.  I see this as properly reflecting separate

3    offenses and different years and different dates, so I

4    will overrule the objection.  And I have looked at

5    Mr. McClain's Criminal History, and I think that V

6    adequately represents it.  So I didn't want to cut you

7    off.

8          MR. McGINTY:  Oh, no, that's okay.

9          THE COURT:  That was just 1 point.  So I

10   will rule just rule on that.

11          Yes, Mr. McClain.

12          THE DEFENDANT:  I am being charged with

13   three counts.  On my indictment, it say 1591-2, and the

14   definition of that count, if I am correct, because I

15   don't understand, it says the definition of that count is

16   a sexual act with a person under the age of 18.

17          Now, part 2 states any commercial sex act as

18   defined in Section 1591 with a person under the age of

19   18, you said I got a two-point enhancement for that?

20          THE COURT:  You got three 2-point

21   enhancements.  Your lawyer didn't object to any of them.

22   One was for use of a computer.  One was because the case

23   involved a minor committing an actual sexual act,

24   prostitution here, and third, because you were a manager

25   or leader of a criminal activity that involved five or

1    fewer people, involved at least you and your

2    co-Defendant, Chardee Barfield.  I think the Government

3    gave you a break because it may have involved five or

4    more if everyone were counted, so you got a break

5    there.

6                   THE DEFENDANT:  So the answer to my

7    question, that would be yes?

8                   THE COURT:  Well, I have answered it, sir.

9    What I really want to know is, do you have anything

10   further that you want to say that reflects that you are

11   accepting responsibility for your conduct because I

12   have carefully read the statement attributed to you on

13   page —

14                  THE DEFENDANT:  The statement I wrote on

15   page 11.

16                  THE COURT:  Right.

17                  THE DEFENDANT:  Paragraph 36.

18                  THE COURT:  Right.  I read that carefully,

19   and in my considered judgment, that does not reflect you

20   accepted responsibility for what you have done.  You are

21   basically saying, "well, it is all her fault.  I asked

22   her for an ID.  She couldn't find her ID, and I didn't

23   know anything, and so that's it."

24                  THE DEFENDANT:  No.  It states that I did

25   meet the person, and I did get her to — I did admit to

1   doing what was said in Count 1.

2                   I also admitted in there that I did drive on

3   the freeway, which was admitting to Count 2, and I also

4   stated that I did have in my possession on my birthday a

5   cellphone containing pictures.  That is admitting to

6   Count 3, correct?

7                   THE COURT:  Mr. McClain, do you have any

8   comprehension of what you did here?

9                   THE DEFENDANT:  I believe I thought I took

10  an open plea for offense level 31 on —

11                  THE COURT:  No.  Forget the offense level,

12  sir.

13                  I want to know:  Do you have any

14  appreciation, understanding for your criminal conduct in

15  this case, what you did?

16                  THE DEFENDANT:  Yeah.

17                  THE COURT:  All right.  What did you do?

18  You tell me what you did.  Just forget the Guidelines,

19  forget the legalese.  Just tell me what you did here,

20  sir.

21                  THE DEFENDANT:  I drove around a bunch of

22  prostitutes.  I was a chauffeur.

23                  THE COURT:  That's all you did?

24                  THE DEFENDANT:  I was in desperate need of

25  money.  I didn't want to sell drugs.

1      THE COURT:  And you didn't know how old
2   these prostitutes were?
3      THE DEFENDANT:  That's not true.
4      THE COURT:  Well, all right.  You still
5   haven't told me enough to get acceptance of
6   responsibility.  You pled guilty to prostituting a girl
7   under the age of 18 and taking her across state lines for
8   prostitution.
9      Do you have any idea what a serious charge
10  that is?
11     THE DEFENDANT:  Yeah.  Yes, your Honor, I
12  really do.
13     THE COURT:  All right.  And what steps did
14  you take to the determine her age, sir?
15     THE DEFENDANT:  Let's see.  I went as far as
16  the Greyhound to get a ticket, which they required an ID
17  for.  I took acceptance as far as asking for an ID.  Only
18  thing I didn't do is meet the parents and go to
19  the Social Security Office and ask for a birth
20  certificate.
21     THE COURT:  Did you see her ID?
22     THE DEFENDANT:  Yes, I did.
23     THE COURT:  And how old did it say she was?
24     THE DEFENDANT:  She was 19.
25     THE COURT:  And you saw a picture of her?

1          THE DEFENDANT:  Yes, I did.

2          THE COURT:  And her ID said she was 19?

3          THE DEFENDANT:  Yes, and did not say

4  (a minor) on it.

5          THE COURT:  All right.  So you are telling

6  me you actually asked her for an ID, and she showed it to

7  you, and the ID showed — said she was 19?

8          THE DEFENDANT:  Yes, your Honor.

9          THE COURT:  You looked at the birth

10  date?

11          THE DEFENDANT:  Yes, your Honor.

12          THE COURT:  All right.  Well, you didn't say

13  that in here.  You basically said you asked her if she

14  had her ID, and she couldn't find it.  So you never saw

15  her ID.

16          THE DEFENDANT:  That's not true, your

17  Honor.

18          THE COURT:  Well, you wrote it here, sir.  I

19  didn't write this.

20          THE DEFENDANT:  You are right.

21          THE COURT:  Okay.  So what you wrote here is

22  not true?

23          THE DEFENDANT:  That's not true.

24          THE COURT:  Well, why did you write it?

25          THE DEFENDANT:  Because it was only a half

1    sheet of page with 16 lines, which you can sum up the

2    thing, so there was not an extra piece of paper to write

3    on.

4                    THE COURT:  What?

5                    THE DEFENDANT:  I summed it up as best as

6    possible.

7                    THE COURT:  Well, why did you sum it up

8    wrong?  You wrote it.

9                    THE DEFENDANT:  I didn't sum it up, your

10   Honor.

11                   THE COURT:  Well, who wrote this statement.

12                   THE DEFENDANT:  To the best of my ability.

13   I wrote it.  I signed it.  My signature is on there.

14                   THE COURT:  All right.  So you wrote it.  So

15   now you are saying that wasn't true?

16                   THE DEFENDANT:  I am not saying that, your

17   Honor.  I am saying I didn't have enough time to finish

18   writing.  I summed it up as best as I could, as much

19   information as I could put on there without having all my

20   paperwork with me.

21                   THE COURT:  You needed paperwork to

22   remember that she showed you an ID that said she was 19

23   years old?

24                   THE DEFENDANT:  To reflect upon the things

25   that happened a year ago as I been sitting there, yes,

1    sir, I did.

2              THE COURT:  I am going to put you under

3    oath.  You raise your right hand, sir.  Will you raise

4    your right hand?  I am putting you under oath.

5              Do you swear or affirm the testimony you are

6    now going to give is the truth, the whole truth, and

7    nothing but the truth under pain and penalty of perjury?

8              THE DEFENDANT:  Yes, your Honor.

9                        ERNEST McCLAIN

10   having been first duly sworn, was examined and

11   testified as follows:

12                        EXAMINATION

13             THE COURT:  Okay.  Now, I am going to ask

14   you again did you ask this young woman for an ID?

15             THE DEFENDANT:  Yes, your Honor.

16             THE COURT:  And when specifically did you

17   ask her for an ID?

18             THE DEFENDANT:  In September, your Honor.

19             THE COURT:  September of what year?

20             THE DEFENDANT:  2011.

21             THE COURT:  All right.  And where was this

22   conversation?  Did she show you an ID?

23             THE DEFENDANT:  In September, yes.

24             THE COURT:  All right.  Look me in the eye,

25   did she show you an ID?

1           THE WITNESS:  Yes, your Honor.  The

2    first conversation was in August, I believe, end of

3    August.

4           THE COURT:  August of 2009?

5           THE DEFENDANT:  No, August of 2011.

6           THE COURT:  August of 2011.

7           THE DEFENDANT:  Yes, first initial contact,

8    first initial questioning, that's when she got her ticket

9    from the Greyhound.

10          THE COURT:  All right.  When specifically,

11   Mr. McClain, did she show you an ID?

12          THE DEFENDANT:  September I want to say the

13   15th.

14          THE COURT:  September 15th of 2011?

15          THE DEFENDANT:  Yes.

16          THE COURT:  September of 2011.  All right.

17          Where was this?  Where were you and the

18   young girl?

19          THE DEFENDANT:  The Earth Flight Club

20   downtown, Cleveland, Ohio.

21          THE COURT:  And you asked that night or that

22   day for an ID?

23          THE DEFENDANT:  I asked her "we going out.

24   We need ID.  Where is your ID?"  She said she had it.

25   She showed me an ID.  I looked at the ID, I looked at the

1        picture, I looked at the address.

2                    THE COURT:  All right.  It had the name that

3        she was giving you?

4                    THE DEFENDANT:  No.  It had a different

5        name.

6                    THE COURT:  Well, why did you accept it?

7                    THE DEFENDANT:  I didn't.  That was the

8        problem.

9                    THE COURT:  So you knew it was a false ID.

10                   THE DEFENDANT:  That's not true.  The

11       picture was her on it.  I am not a detective, I am not a

12       cop.  I don't know a fake ID.  I am asking why is this

13       person lying to me?

14                   THE COURT:  All right.

15                   THE DEFENDANT:  So the person decided to run

16       off, and I did not see the person for almost four

17       and-a-half months.

18                   THE COURT:  All right.  So the young woman

19       handed you an ID with her picture, with someone else's

20       name.  Is that what you are saying?

21                   THE DEFENDANT:  It was (a minor) that was on

22       the ID.

23                   THE COURT:  All right.  And she told you her

24       name was (a minor)?

25                   THE DEFENDANT:  No.  The ticket itself

1        stated that her name was — one second.

2                        THE COURT:  Well, whatever.

3                        The name on the ticket was different

4        than the name on the ID.  Is that what you are

5        saying?

6                        THE DEFENDANT:  Different, the name on the

7        ID and different on the name with the internet thing I

8        had just seen.  It was different than the (a minor) that

9        is in my paperwork.  All three names were different.

10                       THE COURT:  All right.  So you have

11       three different names.  So you know it is a good ID,

12       right?

13                       THE DEFENDANT:  I found that out as of

14       January 3rd, 2012.

15                       THE COURT:  You needed to wait three more

16       months to know that an ID with three different names is

17       not a bad ID?

18                       THE DEFENDANT:  It was not three different

19       names until January 12th, 2013.

20                       THE COURT:  Well, you just said the ID was a

21       different name than the name she told you.

22                       THE DEFENDANT:  Right.  The third name

23       didn't come into play until January —

24                       THE COURT:  All right.  You had two names.

25       You had her name and the name on the ID.

1                    Sir, I am giving you a chance to maybe save

2       you six or seven years in prison.  You only have a few

3       more minutes.

4                    THE DEFENDANT:  I am trying to find the

5       name —

6                    MR. McGINTY:  He said he doesn't — it

7       doesn't matter to him.

8                    THE DEFENDANT:  I admitted my part.

9                    THE COURT:  Well, do you have anything more

10      you wish to say, sir?

11                   THE DEFENDANT:  Well, I met the said person

12      in Columbus.  The person received the ticket from

13      Columbus to Cleveland, Ohio.  The people at Greyhound

14      gave her the ticket.  I paid for the ticket.  I stated

15      that.

16                   THE COURT:  All right.  You bought her a

17      ticket?

18                   THE DEFENDANT:  Yeah.  I paid for the

19      ticket.

20                   THE COURT:  All right.

21                   THE DEFENDANT:  I told her to come to

22      Cleveland because what she was doing in Columbus she

23      could already do —

24                   THE COURT:  Well, tell me that.

25                   THE DEFENDANT:  I told the person that was

1    engaging in prostitution in Columbus, that if you come to

2    Cleveland, you probably will have a better chance and

3    going more places with your prostitution than you would

4    walking around with a $40 hotel in Columbus.  The person

5    accepted my offer.

6                    THE COURT:  All right.

7                    THE DEFENDANT:  Said that she would go to

8    the Greyhound and get on there in a couple days.  She had

9    to straighten some things out with her family.  I left;

10   went out of town; came back.  I get a call that they are

11   coming to Cleveland.  I said "okay.  I will meet you."

12                   Got a call, "you in Cleveland?"

13                   I couldn't meet the person, so I paid

14   somebody to go pick the person up.  They dropped the

15   person off at the hotel room.  I spoke with her.  I

16   left.

17                   THE COURT:  And how did she get to

18   Pittsburgh?  You knew you were arranging to take her to

19   Pittsburgh for prostitution, right?

20                   THE DEFENDANT:  That was five months later.

21                   THE COURT:  All right.  Fine.  And the one

22   time she showed you an ID you knew it was not a valid ID,

23   right?

24                   THE DEFENDANT:  Right.

25                   THE COURT:  Okay.  You never bothered to ask

1    her for a proper ID or correct ID, correct?

2              THE DEFENDANT:  I did.  She didn't have it.

3    I left it alone.  That was after the fact because she

4    stated she had it.  So I left it alone.  After you state

5    that you have something and I asked you for it, you say

6    you don't —

7              THE COURT:  All right.  And you realize that

8    was a big mistake, correct?

9              THE DEFENDANT:  So I left immediately from

10   Pittsburgh and left everything alone.  I just completely

11   left everything alone.

12             THE COURT:  Yeah, and why did you do that?

13             THE DEFENDANT:  Because I got tired of the

14   games.  I could find something better to do with my

15   time.

16             THE COURT:  Well, you may have been tired of

17   the games, but you knew she was prostituting for you and

18   you were making half the money she made, right?

19             THE DEFENDANT:  No, that's not true.

20             THE COURT:  She kept all the money she made.

21   You had nothing to do with it?

22             THE DEFENDANT:  After she got back to Ohio,

23   she was not prostituting for me.

24             THE COURT:  Well, when she was in

25   Pittsburgh, she was, right?

1          THE DEFENDANT:  She didn't prostitute in

2   Pittsburgh.  She went to Pittsburgh with the intent to

3   prostitute.  There was no transactions made in

4   Pittsburgh.

5          THE COURT:  Well, the point was to profit

6   you, and knowing the one time she showed you an ID, it

7   was not a good one you never checked again, right?

8          THE DEFENDANT:  I never received the ID.  I

9   asked again.  I inquired.

10          THE COURT:  Well, she didn't show it.

11          THE DEFENDANT:  Correct.

12          THE COURT:  And you realize that was a big

13   mistake?

14          THE DEFENDANT:  Yes, and I got upset, and I

15   left it alone.  I got tired of the games.

16          THE COURT:  All right.  Is there anything

17   else you want to say, sir, before I pronounce sentence?

18   I've asked questions.  Now is your opportunity.  If there

19   is anything else you want to say, this is your

20   opportunity.

21          THE DEFENDANT:  I want to apologize to my

22   parent, my mother, my grandmother, I want to do that.  As

23   far as the comment, you know, I just want to apologize to

24   my mother, my daughter, my sister.  I was raised by

25   females, so I may not know what was going on, but I

1     didn't choose this life.

2              I ask that the Court — I am asking you — I

3     want to be home before I am 60.  I didn't kill nobody.

4     There is people intending to blow up buildings around

5     here getting ten years, and I am facing 30 because of

6     something that seems to be more severe than endangering

7     the lives of people in the United States of America.

8              You got 107 people on a drug conspiracy, and

9     everybody got less time than me put together.  So I am

10    asking for your mercy of not getting the full thing.  The

11    departure, I am not too worried about it.  I am worried

12    about the long end.

13              THE COURT:  Okay.  Thank you, sir.

14              Mr. Sullivan or Ms. Klump, anything you

15    would like to say on behalf of the Government?

16              MR. SULLIVAN:  Thank you, Judge.  Well,

17    just in trying to assess the 3553(a) factors, I think the

18    seriousness of the offense can't be stated more strongly.

19    We have been talking here about a man who prostituted a

20    15 year-old child repeatedly in numerous locations across

21    the Northern District of Ohio and also in Pittsburgh.

22              And it was on more than one occasion, and I

23    think it is clear from the factual — I am not sure if it

24    is really clear from the factual basis of what's written

25    in the PSR — but he met her in Columbus.  He paid for

1       her trip to come to Cleveland, so she could prostitute

2       for him.  She did repeatedly.  She was then dropped off

3       at a youth homeless shelter.

4               From there, she was sent back home to

5       Columbus to her family.  He then picked her up in

6       Columbus and took her to Pittsburgh.  So on two separate

7       periods he had taken this child and had her prostitute

8       herself on numerous occasions, numerous times.

9               You know, Mr. McGinty talked much about the

10      Defendant's troubled childhood history and difficulty

11      growing up and some of the difficulties he endured.  That

12      may all be true, but as an adult, when faced with a 15

13      year-old child, obviously, a troubled child, he had a

14      choice of whether he could try to end that cycle for

15      another child or perpetuate it, and he chose to

16      perpetuate it by profiting from her exploitation.

17              So even though he was a product of a

18      troubled youth, he did nothing to try to help the next

19      generation.  He helped ensure that another child is going

20      to become an adult who will have a troubled youth because

21      she was forced to prostitute for him repeatedly across

22      the District.

23              As far as the Defendant's history and

24      characteristics, again, his Criminal History score

25      reflects his Criminal History and characteristics and

1    shows that certainly the Defendant is like an athlete,

2    can do several different events.  We have drug offenses,

3    stolen property offenses, violent — resisting arrest,

4    escape, and now we have child sex trafficking.

5            He is a young man and he has a long record

6    already engaging in criminal activity, and, you know, I

7    think maybe when you are assessing whether or not the

8    Defendant accepted responsibility, maybe his last

9    statement would be the most helpful because in the list

10   of people he apologized to notably absent was the victim

11   in this case.

12           The victim was 15 years old and has been

13   exploited by him for his profit.  I think that shows

14   certainly whether or not he accepted responsibility but

15   also shows his true feelings in this case, and I think it

16   reflects why his sentence in the Guidelines is the

17   sentence that is necessary in this case, and we would ask

18   you to pass sentence.

19           THE COURT:  Thank you, Mr. Sullivan.

20           The Court has reviewed the very thorough

21   report, and I guess I should mention we had Mr. Capuano

22   here subbing for Mr. Abraham.  The Court has reviewed the

23   thorough report, and I have listened both carefully to

24   both counsel and at length to Mr. McClain.

25           The touchstone of sentencing is 18 U.S.C.

1    3553(a), and I am required to learn everything I can

2    about Mr. McClain, everything I can learn about these

3    offenses, compute the advisory range correctly, which I

4    have done, and consider it along with all the other

5    factors set out in the statute and, ultimately, give a

6    sentence that is sufficient but not greater than

7    necessary to meet the statutory purpose of sentencing,

8    punishment, deterrence, protecting the community, and

9    rehabilitation.  All right.

10                First, although it took a long time to

11   accomplish it, I will find that Mr. McClain has accepted

12   responsibility for his conduct and give you the 2 points

13   for acceptance and the third level off for a timely

14   guilty plea.

15                That gives you an adjusted offense level of

16   33, Criminal History Category V, 210 to 262 months, and,

17   Mr. McClain, you need to understand that you got a big

18   break.  I didn't have to do it based on what you had

19   written, and I certainly didn't have to engage in about a

20   ten-minute discussion with you to finally bring it out,

21   but I did it because I thought that you did understand

22   the seriousness of what you did.

23                You had just not acknowledged it publicly,

24   and I thought it was important that you do it so I've

25   determined that you had.

1        Next, I do find that a sentence within the

2   advisory range is sufficient but not greater than

3   necessary to accomplish those purposes of punishment

4   deterrence, protecting the community, and rehabilitation.

5   This is a very serious crime, taking a minor across state

6   lines for sex trafficking, and I am going to sentence you

7   in the middle of the range, 240 months, and that's 20

8   years.  My feeling is, if that doesn't do it, a longer

9   sentence isn't going to accomplish anything.

10       That sentence will be followed by five years

11  of supervised release.  There will be drug, alcohol,

12  mental health aftercare, the SORNA provisions, and search

13  and seizure.  I am not imposing a fine.  I don't believe

14  you have the resources to pay one.

15       There is a mandatory $300 special

16  assessment, $100 on each of the three counts due and

17  payable immediately.

18       Mr. McClain, you are a young person.  You

19  have had a pretty hard life.  There are a lot of things

20  that happened to you that shouldn't happen to anyone.

21  Some were not of your choosing at all, but the drug and

22  alcohol use were, and running a prostitution ring and

23  doing some of the other things you did, those were your

24  choosing.

25       You can't blame that on anyone else, but you

1    will still be relatively young when you get out, and I

2    think you have the capacity to do something different,

3    but it will be your choice.

4              I believe under the plea agreement you have

5    waived your right to appeal, but out of an abundance of

6    caution, I advise each Defendant of his right to appeal

7    the conviction and/or the sentence.  So if you wish to do

8    so, you have 14 days, and you should consult with

9    Mr. McGinty about that.

10             Do you understand you have that right?

11             THE DEFENDANT:  Yes, your Honor.

12             THE COURT:  All right.  Are there any

13   objections that either counsel wish to place on the

14   record?

15             MR. SULLIVAN:  No objection, Judge.  I would

16   first of all, say that there was no plea agreement in

17   this case.

18             THE COURT:  Oh, all right.  I forgot.  I

19   made a mistake.

20             Then, of course, Mr. McClain has the right

21   to appeal, which I advised him of.  You are right, he

22   pled to the indictment, you are correct.

23             MR. SULLIVAN:  And the only other point,

24   Judge, if you could just now order that the record of

25   this proceeding be redacted in the three instances where

1    the victim's name was mentioned in open Court —

2              THE COURT:  What I will do, we will just put

3    a bracket around that portion.  I will direct the court

4    reporter to do that.  It was probably my fault for

5    eliciting it and not taking steps not to.  So it is my

6    error, and we will just put a bracket around the specific

7    name of the victim because we have taken steps to avoid

8    that.

9              Okay.  Anything further that either counsel

10    wish to place on the record?

11              MR. McGINTY:  No, your Honor.

12              MR. SULLIVAN:  No.  And you have no

13    objection to any of that?

14              MR. McGINTY:  No, I didn't.

15              THE COURT:  All right.  And then lastly,

16    Mr. McClain, Mr. McGinty has mentioned you do have a

17    number of family members in the back.  I know it is not

18    easy for them to be here for this, and it is probably not

19    so easy for you to have them here, but you are lucky to

20    have a supportive family.

21              Sadly, I sentence people because they walk

22    in alone, and they walk out alone, and so I appreciate

23    their attendance today, and with that, we are adjourned.

24    Thank you.

25             (Hearing concluded 2:25 p.m.)

1                          - - - - -

2                    C E R T I F I C A T E

3              I, George J. Staiduhar, Official Court

4     Reporter in and for the United States District Court,

5     for the Northern District of Ohio, Eastern Division,

6     do hereby certify that the foregoing is a true

7     and correct transcript of the proceedings herein.

8

9

10

11                     s/George J. Staiduhar
                       George J. Staiduhar,
12                     Official Court Reporter

13                     U.S. District Court
                       801 W. Superior Ave., Suite 7-184
14                     Cleveland, Ohio 44113
                       (216) 357-7128
15

16

17

18

19

20

21

22

23

24

25